## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## EASTERN DIVISION

JEFFERY L. CRAWFORD,
Reg. #35243-044                                              PLAINTIFF

V.                             2:12CV00224 SWW/JTR

NADER PEIKAR, Doctor,
FCI-FC, et al.                                               DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District

Judge Susan Webber Wright. Any party may serve and file written objections to this

recommendation.  Objections should be specific and should include the factual or

legal basis for the objection.  If the objection is to a factual finding, specifically

identify that finding and the evidence that supports your objection.  An original and

one copy of your objections must be received in the office of the United States District

Clerk no later than fourteen (14) days from the date of the findings and

recommendations.  The copy will be furnished to the opposing party.  Failure to file

timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new,

different, or additional evidence, and to have a hearing for this purpose before the

United States District Judge, you must, at the same time that you file your written

objections, include a "Statement of Necessity" that sets forth the following:

1.   Why the record made before the Magistrate Judge is inadequate.

2.   Why the evidence to be proffered at the requested hearing
     before the United States District Judge was not offered at
     the hearing before the Magistrate Judge.

3.   An offer of proof setting forth the details of any testimony
     or other evidence (including copies of any documents)
     desired to be introduced at the requested hearing before the
     United States District Judge.

From this submission, the United States District Judge will determine the necessity

for an additional evidentiary hearing, either before the Magistrate Judge or before the

District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

## I. Introduction

Plaintiff, Jeffrey L. Crawford, is a prisoner who formerly was incarcerated in

the Federal Correctional Complex, Forrest City ("FCC-Forrest City").[1] In this *pro se*

*Bivens* action, he alleges that his constitutional rights were violated at FCC-Forrest

---

[1]He is currently incarcerated at the Federal Medical Center, Fort Worth.

City when Defendants failed to provide him adequate medical care for "spinal and nerve damage" to his back."[2]

Defendants have filed a Motion for Summary Judgment and supportive pleadings. *Docs. 97-99.* Plaintiff has responded.[3]  *Docs. 102-104.*

## II.  Facts

Before discussing the merits of Defendants' Motion for Summary Judgment, the Court will summarize the relevant undisputed facts:[4]

1.     On December 6, 2010, Plaintiff arrived at FCC-Forrest City and underwent medical screening and physicals over the next four days. *Doc. 99-3 at 2.* He reported hypertension, hemorrhoids, and having leg pain with no numbness or

---

[2]Defendants are employees or former employees of the BOP at FCC-Forrest City. Plaintiff's remaining inadequate medical care claims are against: (1) Dr. Nadar Peikar, a staff physician (now reassigned to another BOP institution); (2) Mary Ellen Rivers-Graham, Health Services Administrator; (3) Brenda Hoy, Assistant Health Services Administrator; (4) Stephanie McCay, RN; (5) Mary Roberts, RN; (6) Denese Heuett, Associate Warden (now reassigned to another BOP institution); (7) Timothy Outlaw, Warden (now retired); (8) Darlene Gallardo, Unit Manager; (9) Kenneth Brown, Counselor; (10) Kevin Ward, RN; (11) Kathleen Maples, Mid-Level Practitioner; and (12) Michelle Wingo, Mid-Level Practitioner. Plaintiff also asserted inadequate medical care claims against: (1) Dr. William Resto, Clinical Director; and (2) Misty Rios, RN.

On June 28, 2013, the Court dismissed Plaintiff's inadequate medical care claims against Defendants Resto and Rios because they were Public Health Services officers who were statutorily immune to *Bivens* liability under 42 U.S.C. § 233(a). Docs. 58, 61.

[3] In Plaintiff's Response to Defendants' Motion for Summary Judgment (*doc. 103*), he mistakenly characterizes his lawsuit as asserting both *Bivens* inadequate medical care claims *and* negligence claims under the Federal Tort Claims Act ("FTCA"). Plaintiff has *never* pleaded a FTCA negligence claim, and the United States is *not* a named defendant in this lawsuit.

[4] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

tingling for one month "no MOI [mechanism of injury] known." *Doc. 99-3 at 16, 30.* He had a full range of motion in his left lower extremity, and a negative straight leg raise. *Doc. 99-3 at 34.* When he arrived at FCC-Forrest City, he was 49 years old.

2.      At sick call on December 22, 2010, Plaintiff was seen by Defendant Dr. Peikar for complaints of hypertension and hemorrhoids.[5] *Doc. 99-3 at 39*.

3.      On December 28, 2010, Plaintiff submitted a "request to staff" form complaining of extreme pain in his left leg. *Doc. 99-3 at 44.*

4.      On January 3, 2011, Plaintiff had a dental visit, and on January 4, 2011, he failed to appear for a routine chest x-ray. *Doc. 99-3 at 46-49.*

5.      On January 20, 2011, Defendant PA Wingo responded to Plaintiff's December 28, 2010 "request to staff," placing him on sick call. *Doc. 99-3 at 44.*

6.      At sick call on February 8, 2011, Plaintiff saw PA Wingo complaining of left back pain going into his left calf with "no MOI." *Doc. 99-3 at 53.* He stated that he had the pain for a month, and it was worsening, with no numbness or tingling. *Doc. 99-3 at 53.* Wingo prescribed steroids and ordered hip and lumbar x-rays. *Id. at 54.* Plaintiff was ambulating with crutches.[6]

---

[5]In his Affidavit, Plaintiff generally states that the medical records produced by Defendants are "incomplete" and that not all of his complaints of pain were noted. *Doc. 104 at 2.* According to Plaintiff, "there are at least fifty instances in which his complaints are not noted." *Id.*

[6]According to Plaintiff, he also complained of leg weakness and had a foot drop in his February 8, 2011 visit, but this was not documented. *Doc. 102 at 5.*

4

7.      At sick call on February 13, 2011, Plaintiff saw RN Barker complaining of left side pain and weakness that worsened overnight. *Doc. 99-3 at 56.* She called Dr. Kenneth Russell, who called in a prescription for tylenol with codeine, and scheduled him to return in the morning so he could be seen by a physician.

8.      At sick call on February 14, 2014, Plaintiff saw Dr. Russell, who gave him a steroid injection. *Doc. 99-3 at 60, 62.* Dr. Russell noted that "if there is true weakness, not just because of pain that this is an urgent case to get to the neurosurgeon or neurologist." *Doc. 99-3 at 60.* Plaintiff denied a "history of injury" to his back. *Doc. 99-3 at 61.*

9.      On February 15, 2011, Plaintiff was "sent to health services per officer's request for evaluation by medical . . . [Plaintiff] left health services without being seen by medical staff." *Doc. 99-3 at 65.*

10.     At sick call on February 16, 2011, Plaintiff was seen by RN Rios and Dr. Peikar and complained of back pain and left leg pain and numbness. *Doc. 99-4 at 2.* He stated that the prior steroid injection had helped and that he "was still sore but not in extreme pain." He also reported a 2006 motor vehicle accident which caused a back injury. *Doc. 99-4 at 2.* He stated that the pain started in December of 2010, but that he had been "dealing with it" and it was getting worse. *Id.* RN Rios provided Plaintiff with a wheelchair. *Doc. 99-4 at 6.* Plaintiff's lumbar and hip x-rays were noted to be

"pending radiology report." *Doc. 99-4 at 4*. Dr. Peikar noted that Plaintiff had spasms, and "Instructed patient to rest. Discussed that some medications can help reduce the spastic process. Encouraged patient to use hot and cold showers to help relax muscles. Instructed patient to fold up blanket or coat and put it . . . under his knees when he sleeps at night. Ibuprofen will help reduce inflammatory process and muscle pain. Soft shoes will help reduce pain as well. Avoid twisting positions. Educated patient on proper body mechanics. Patient given back strengthening and stretching exercises. Will provide [wheelchair] until Feb 28th and then re-evaluate patient's status." *Doc. 99-4 at 6*. Plaintiff was also given a sheet with back exercises. *Doc. 99-4 at 6*.

11.     At sick call on February 28, 2011, Plaintiff returned to RN Rios complaining of pain and numbness in his back and left leg. *Doc. 99-4 at 9*. He told Rios that he had twice urinated on himself because he could not get to the bathroom in time, and he had so much pain that he had to use the wheelchair to ambulate. RN Rios referred Plaintiff for a MRI noting that his pain had worsened since December 2010 and his left leg function had decreased since his February 16, 2011 neurological exam. *Doc. 99-4 at 11*.

12.     On March 3, 2011, Plaintiff had a lumbar MRI, and the March 4, 2011 MRI report showed a large herniated disc at L5-S1. *Doc. 99-4 at 18*.

13.     At sick call on March 9, 2011, Dr. Peikar saw Plaintiff and reviewed the MRI report.[7] He then referred Plaintiff to "neurosurgery." *Doc. 99-4 at 20.* The same day, Plaintiff was transported to the ER at St. Francis Hospital in Memphis, where he was admitted. *Doc. 99-4 at 37, 40-41.*

14.     On March 15, 2011, Plaintiff underwent an L5-S1 hemilaminectomy, performed by Dr. Harry Friedman, a neurosurgeon at St. Francis Hospital, to repair the large ruptured disc. *Doc. 99-4 at 44.* Plaintiff "tolerated the procedure well and was able to ambulate without much pain following surgery." *Doc. 99-4 at 24.* However, he later developed a postoperative bowel ileus and was not discharged from the hospital until March 21, 2011.

15.     Dr. William Rawlinson's March 21, 2011 discharge summary stated that Plaintiff was "returned back to the prison and will resume normal activities." *Doc. 99-4 at 24.*

16.     A March 21, 2011, St. Francis Hospital "discharge instructions" form was checked to indicate that Plaintiff had "no restrictions" on "activity." *Doc. 99-4 at 26.*

17.     Dr. Friedman's March 21, 2011 discharge note states that Plaintiff's "strength was normal," and that he had given Plaintiff "instructions in his back

---

[7]In the March 9, 2011 visit with Dr. Peikar, Plaintiff related that he had a fall in a county jail in July of 2009 where he injured his back. *Doc. 99-4 at 20.*

exercises[.]" *Doc. 99-4 at 27.* He also noted that he "will not necessarily have the patient come back for followup unless Dr. Peikar feels it necessary." *Id.* Dr. Friedman provided Plaintiff with a generic form list entitled "instructions following lumbar or cervical disc surgery" that initially restricts a patient from bending from the waist, and from lifting in excess of fifteen pounds, with weight to increase gradually. *Doc. 99-1 at 18.* The instruction form also advised patients to do back exercises twice a day staring ten days after surgery. *Doc. 99-1 at 18.*

18.    On March 21, 2011, Plaintiff returned to FCC-Forrest City and was examined by RN Kevin Ward. *Doc. 99-2 at 10-12.* Plaintiff was prescribed tylenol with codeine for pain. *Doc. 99-2 at 11.* Plaintiff was "discharged to housing unit with convalescence." *Doc. 99-2 at 11.*

19.    On March 22, 2011, Plaintiff saw Dr. Peikar, who noted that Plaintiff had regained motor function in his lower extremities, and had normal bowel and bladder function. *Doc. 99-4 at 51.* Dr. Peikar also noted: "Plan,  discussed minimal walk as tolerated, not lift any wt of more than five lbs, advised of physical therapy, rehab diets as tolerated, pain management PRN [as needed], bowel regimen, f/up if needed." *Doc. 99-2 at 15.* Dr. Peikar requested a "refer[ral] to physical therapy, status post L5-S1 diskectomy day #6[.]" *Doc. 99-4 at 52.*

20.     On March 23, 2011, Dr. Peikar issued a "lower bunk" order for Plaintiff.[8] *Doc. 99-4 at 55.*

21.     At sick call on March 24, 2011, Plaintiff saw RN Rios, complaining of blood in his urine. A urinalysis was positive for blood and he was treated with antibiotics and scheduled for a follow up urinalyses. RN Rios also noted: "Patient recently had diskectomy and continues to use [wheelchair]. Dr. Peikar would like to see patient ambulate more. Can continue with [wheelchair] 1 more week to assist him across the large compound. Will schedule patient in 1 week to return [wheelchair] and will issue patient rollator walker x 2 months. Goal set to [discontinue] all assistive devices in 2 months." *Doc. 99-4 at 58.*

22.     At sick call on March 31, 2011, Plaintiff saw Dr. Peikar complaining that he was still having some pain and stiffness. *Doc. 99-4 at 66.* Dr. Peikar extended Plaintiff's use of a wheelchair for two more weeks. *Doc. 99-4 at 66.*

23.     On April 19, 2011, Plaintiff saw RN Rios for a follow up. They discussed the transition from a wheelchair to a walker: "Patient instructed that he can use walker to get across the compound and he is to take his time and go slowly. If he becomes tired then he can stop for a moment and rest on the rollator seat. Verbalizes

---

[8]In Plaintiff's Affidavit, he states that he still had his upper bunk assignment when he returned to FCC-Forrest City following surgery, and had to sleep in his wheelchair. *Doc. 104 at 2*. He did not get the lower bunk pass until he complained. *Id.*

understanding. Goal to set transition from rollator walker to cane in the next 3-4 weeks." *Doc. 99-4 at 66.* She also noted that Plaintiff "continues to be on lower bunk and does not currently have a job." *Doc. 99-4 at 67.*

24.    At sick call on May 5, 2011, Plaintiff saw RN Stephanie McCay and reported that his rollator walker was broken. *Doc.  99-2 at 17.* She contacted Dr. Peikar, who instructed her to take the walker because Plaintiff "must ambulate freely." *Doc.  99-2 at 17.* Dr. Peikar also stated that there was no medical need for Plaintiff to have an ambulation device. Plaintiff left and was "ambulating [fairly] well without any assistance." *Doc.  99-2 at 17.*

25.    On June 27, 2011, Plaintiff was transported to "Phoenix Neurosurgery" but was "returned without treatment" because it was not the clinic of Plaintiff's treating neurosurgeon, Dr. Friedman. *Doc. 99-4 at 73.*

26.    On July 6, 2011, Plaintiff was transported to a physical therapy session at the Forrest City Medical Center. *Doc.  99-2 at 19, 30-35.* The therapist noted a treatment plan to include two more sessions of therapy. *Doc.  99-2 at 33.* However, Defendants concede that the July 6, 2011 therapy session was the sole physical therapy that Plaintiff received. *Doc. 99 at ¶56.*

27.    At sick call on August 19, 2011, Plaintiff complained to Dr. Obi-Okoye Nwannem that he had not had a follow up appointment with his neurosurgeon. *Doc.*

*99-4 at 85.* He complained of back pain, but stated that he did not want any pain medication. *Id.* Plaintiff had a full range of motion in his lumbar spine, a normal straight-leg raise, and normal reflexes. *Doc. 99-4 at 87.*

28.     At sick call on August 24, 2011, Plaintiff complained of back pain and was seen by Dr. Barifi Opare-Addo, who noted that a "neurosurgery consult was placed." *Doc. 99-4 at 91.*

29.     At sick call on August 30, 2011, Plaintiff was seen by CRNP Laurie Steward for a refill of hemorrhoid suppositories. *Doc. 99-4 at 95.* Plaintiff stated he did not need medication for his back pain.

30.     At sick call on September 28, 2011, Plaintiff asked about his follow-up appointment with his neurosurgeon, and he was told it was scheduled. *Doc. 99-4 at 98.* He did not want back pain medication because "it clogs him up." *Doc. 99-4 at 98.*

31.     On October 18, 2011, Plaintiff was transported to see Dr. Friedman in Memphis. Dr. Friedman examined Plaintiff: "Motor functions were normal. Sensory functions demonstrated decreased sensation to pinprick in the left medial dorsum foot and lower ½ medial calf and foot. Reflexes were 1+ in the knees and trace in the ankles. Straight leg raises were to 80 degrees on the right without pain and to 80 degrees on the left producing complaints of lower back pain. Lumbar range of motion in all directions produced complaints of left lower back pain but the examination was

limited due to restraints." *Doc. 99-2 at 37*. Dr. Friedman gave Plaintiff instructions on back exercises, advised him to use heat and hot showers, and take NSAID's. *Doc. 99-2 at 37*.

32.     At sick call on December 14, 2011, RN Rios informed Plaintiff that Dr. Peikar did not want him to have a wheelchair or walker. Plaintiff was ambulatory without complications and had a steady gait and no complications. *Doc. 99-5 at 2*. He was instructed on the importance of exercise and "to avoid assistive devices unless indicated." Dr. Peikar approved Plaintiff to have medical shoes, a glove for a disfigured hand, and a back brace.

33.     At sick call on January 9, 2012, Plaintiff saw Dr. Peikar and complained of "persistent off and on" back pain, reflux, and hypertension. *Doc. 99-5 at 10*. Dr. Peikar noted that he would "refer [Plaintiff] to physical therapy[.]" *Doc. 99-5 at 13*.

34.     On March 12, 2012, Plaintiff was seen at sick call for an injury to his right hand. *Doc. 99-5 at 16*.

35.     On May 8 and 9, 2012, Plaintiff was seen at sick call for shingles. *Doc. 99-5 at 18, 22*.

36.     On June 25, 26, and 27, 2012, Plaintiff was seen at sick call for hypertension, replacements of his medical shoes and hose, ear pain, and lip irritation. *Doc. 99-5*.

37.    In August of 2012, Plaintiff saw Dr. Peikar and RN Rios for multiple complaints of bleeding hemorrhoids, hypertension, and reflux. *Doc. 99-5 at 45-69.*

38.    On August 27, 2012, Plaintiff saw RN Rios after his leg "gave out" in the food service hall: "Patient fell out in food service after being denied lay-in at this morning's evaluation for c/o hemorrhoid pain. Approx 4 hours later a medical emergency was called at camp [because] patient had fallen out during main line. Upon arrival patient alert and oriented X 3 . . . States 'my leg just buckled and gave out on me and I fell.' Patient states he thinks left leg pain is related to hemorrhoid pain.  . . Patient laying on medical bed and he refuses to sit up. Asked patient to sit up to complete a more thorough medical exam. States 'I can't.' . . . Waited approximately 20 minutes. After I told patient he could have [wheelchair] for two days until Dr. Peikar sees him he was able to sit up unassisted. Inmate stood up fully and got himself into the [wheelchair]." *Doc. 99-5 at 72.*

39.    On August 29, 2012, Plaintiff had a follow up with Dr. Peikar. Plaintiff had an external hemorrhoid that needed surgical excision. *Doc. 99-5 at 77.* On August 31, 2012, Plaintiff was admitted to the Forrest City Hospital for hemorrhoid surgery. *Doc. 99-5 at 79.* On September 2, 2012, he was discharged and returned to FCC-Forrest City. *Doc. 99-5 at 81.*

13

## III. Discussion

### A.  Exhaustion of § 1983 Claims

The Prison Litigation Reform Act ("PLRA") provides that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The purposes of the exhaustion requirement include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007); *see also Woodford v. Ngo*, 548 U.S. 81, 89–91 (2006).

The PLRA requires inmates to: (1) fully and *properly* exhaust their administrative remedies as to each claim in the complaint; and (2) complete the exhaustion process prior to filing an action in federal court. *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000) (emphasis added). Importantly, the Supreme Court has emphasized that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218; *see also Woodford*, 548 U.S. at 90 (explaining

that administrative exhaustion "means using all steps that the agency holds out, and doing so properly so that the agency addresses the issues on the merits"). Thus, to satisfy the PLRA, a prisoner must fully comply with the specific procedural requirements of the incarcerating facility. Id.

To fully exhaust administrative remedies within the BOP, a federal prisoner must: (1) submit an Informal Resolution to the appropriate staff member; (2) file an Administrative Remedy Request with the Warden, if the attempt at informal resolution is unsatisfactory; (3) appeal the Warden's response to the Regional Director; and (4) appeal the Regional Director's response to the General Counsel. *See* 28 C.F.R. § 542.10 to 542.18

Defendants concede that Plaintiff fully exhausted two administrative remedies concerning inadequate medical care for his back problems, yet argue that he did not fully exhaust administrative remedies with regard to other claims about hemorrhoids, work placement, pay, cell placement, derogatory language, and a fall in a Missouri jail prior to his arrival at FCC-Forrest City. Defendants' exhaustion argument on those claims is moot because, at screening, the Court limited this case to Plaintiff's claims that he received inadequate medical care at FCC-Forrest City for "nerve and spinal damage." *Docs. 6 and 8*.

### B.     Respondeat Superior Liability

Separate Defendants Outlaw (the former warden) and Heuett (the former associate warden) argue that they are entitled to summary judgment because Plaintiff has presented no evidence that they participated in Plaintiff's medical care. Importantly, it is well settled that the doctrine of *respondeat superior* does not apply to *Bivens* actions, and that a supervisor, such as a prison warden, can only be held liable for his or her personal actions. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Buford v. Runyon*, 160 F.3d 1199, 1203 n. 7 (8th Cir. 1998).

Plaintiff's medical records do not establish that Defendants Outlaw and Heuett were involved in any aspect of his medical care, and Plaintiff has come forward with no evidence to the contrary. Thus, Defendants Outlaw and Heuett are entitled to summary judgment on Plaintiff's inadequate medical care claims.

### C.     Plaintiff's Inadequate Medical Care Claims

Plaintiff argues that Defendants provided him with constitutionally inadequate medical care, causing him "spinal and nerve damage," by: (1) failing to timely diagnose and treat his complaints of back pain; (2) failing to provide him with timely physical therapy after his back surgery; and (3) denying him ambulative devices after his back surgery. *Docs. 5, 104*.

To succeed with his Eighth Amendment inadequate medical care claims,

Plaintiff must prove that: (1) he had objectively serious medical needs; and (2) Defendants subjectively knew of, but deliberately disregarded, those serious needs. *See Estelle v. Gamble*, 429 U.S. 97 (1976); *Langford v. Norris,* 614 F.3d 445, 460 (8th Cir. 2010).

Defendants do not dispute that Plaintiffs's herniated disc and back problems were objectively serious medical needs. Thus, the issue is whether Defendants were deliberately indifferent in treating those serious medical needs.

Deliberate indifference, which is a higher standard than gross negligence, "requires proof of a reckless disregard of the known risk." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001). In other words, "there must be actual knowledge of the risk of harm, followed by deliberate inaction amounting to callousness." *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998). Moreover, negligence, gross negligence, or a mere disagreement with the treatment decisions does not rise to the level of a constitutional violation. *Langford,* 614 F.3d at 460; *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006).

Plaintiff argues that Defendants did "nothing to help him" from his first complaint of leg pain, at intake in December of 2010, until he underwent back surgery on March 9, 2011. *Doc. 102 at 4*. While he acknowledges that he received pain medication, he claims that "no actual progress was made to attempt to solve" his

17

"underlying spinal canal nerve damage." *Id.*

The undisputed medical records establish that, from Plaintiff's first complaint of leg pain, in December of 2010, until the time that Plaintiff was transported and admitted to the hospital on March 9, 2011, FCC-Forrest City health services personnel evaluated and treated Plaintiff's escalating complaints of pain. Plaintiff was prescribed pain medication, given steroids and anti-inflammatories, was provided with ambulation devices, had x-rays, an MRI, and was referred to appropriate medical specialists at St. Francis Hospital in Memphis, Tennessee. This almost continuous and progressive treatment culminated in Plaintiff's admission to St. Francis Hospital for back surgery.

Contrary to Plaintiff's subjective characterization of the medical records, his complaints of pain were always evaluated and treated, and the level of treatment and diagnostic procedures were escalated as his symptoms worsened. *See Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (finding no deliberate indifference when medical providers treated the inmate on "numerous occasions" and "made efforts to cure the problem in a reasonable and sensible manner"); *Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir. 1994) (finding no deliberate indifference when the medical personnel provided a prisoner with "an escalating level of treatment for [his] aliments over time").

18

With respect to Plaintiff's claim that his back surgery was unconstitutionally delayed, he has not provided *any* evidence to support that allegation or demonstrate that he was harmed by any such delay. There is nothing in the medical records of Plaintiff's treating neurosurgeon, Dr. Friedman, indicating that Plaintiff's prognosis was worsened by any supposed delay in Plaintiff's back surgery. *See Gibson v. Weber*, 433 F.3d 642, 646-47 (8th Cir. 2006) (explaining that, to avoid summary judgment, an inmate must place verifying medical evidence in the record to establish the detrimental effect of the alleged delay in medical treatment); *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (to avoid summary judgment, an inmate must show that a defendant ignored a critical or escalating medical situation, or that the delay adversely affected the inmate's prognosis).

With respect to Plaintiff's claim that he was denied adequate medical care because he only received one session of physical therapy months after surgery, there is nothing in Plaintiff's medical records from his treating neurosurgeon indicating that Plaintiff *required* physical therapy following his back surgery. Dr. Friedman's March 21, 2011 discharge note only states that he gave Plaintiff instructions on *back exercises* that he should perform.

Plaintiff points out that Defendant Dr. Peikar, upon Plaintiff's return to FCC-Forrest City after his back surgery, referred Plaintiff for physical therapy on March

22, 2011. While Plaintiff only had one session of physical therapy, on July 6, 2011, there is no medical evidence that any lack of physical therapy harmed him in any way. Importantly, when Plaintiff had his follow up appointment with his treating neurosurgeon on October 18, 2011, Dr. Friedman prescribed nothing but conservative treatment for Plaintiff's complaint of back pain: back exercises, the use of heat and hot showers, and NSAID's. Furthermore, Dr. Friedman did not limit Plaintiff's activities in any way.

In the same vein, there is no medical evidence that Plaintiff *required* any ambulation device following his back surgery. To the contrary, his discharge instructions from the hospital returned him to normal activity. Furthermore, the medical evidence establishes that, once Plaintiff returned to FCC-Forrest City following his back surgery, his treatment plan required him to transition from a wheelchair, to a walker, to a cane, and then to ambulation without assistive devices. When Plaintiff saw Dr. Friedman for his follow-up appointment in October of 2011, he did not prescribe any assistive devices for Plaintiff's ambulation or restrict him in any way. Plaintiff's claim that he was somehow unconstitutionally deprived of an ambulation device is no more than his subjective disagreement with a treatment decision by his neurosurgeon and his other FCC-Forrest City medical care specialists. *See Langford*, 614 F.3d at 460 (holding that a prisoner's disagreement with a medical

provider's treatment decisions does not rise to the level of a constitutional violation).

## IV.  Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.      Defendants' Motion for Summary Judgment (*Doc. 97*) be GRANTED, and this case be DISMISSED, WITH PREJUDICE.

2.      The Court CERTIFY, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from any Order adopting this Recommended Disposition would not be taken in good faith.

Dated this $\underline{11^{th}}$ day of July, 2014.

_____
UNITED STATES MAGISTRATE JUDGE